**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**JENNIFER FRENSLEY**                                                                                      **PLAINTIFF**

**V.**                                 **CIVIL ACTION NO. 1:09-CV-118-SA-JAD**

**NORTH MISSISSIPPI MEDICAL CENTER,
INC., et al.**                                                                               **DEFENDANTS**

**MEMORANDUM OPINION**

For the reasons stated below, the Court grants Defendant J. Michael Denham's Motion for Summary Judgment [47].

**I. BACKGROUND**

Jennifer Frensley became the interim nurse-manager of the Intensive Care Unit (ICU) at North Mississippi Medical Center (NMMC) in December 2006, and she became the nurse-manager of the ICU in April 2007. At that time, NMMC's ICU provided services to both medical patients and surgery patients. As nurse-manager, Frensley was responsible for managing the daily activities of the ICU, under the supervision of Defendant Michael Denham.

In August 2007, NMMC administrators and physicians became concerned that ICU patients were being diverted to other hospitals more often than was reasonable, a practice that adversely impacted the financial position of the hospital. Around the end of 2007, the hospital's Medical Executive Committee addressed the issue by forming a task force to investigate. Numerous physicians and management staff associated with the ICU - including Denham - were members of the task force. The task force addressed topics of staffing, training, leadership within the ICU, and how they could avoid further diversion of patients. Frensley herself attended some task force meetings.

On a few occasions during her tenure as nurse-manager, Frensley expressed frustration with the challenges of managing the ICU. In August 2007, she tendered a written resignation to Denham. She then met with Denham and Charles Stokes - the president of NMMC - to discuss potential methods of addressing the ICU's staffing problems, and she agreed to remain in the nurse-manager position. After this meeting, Denham assigned a personal assistant to relieve some of Frensley's administrative duties. However, Frensley continued to experience frustration with the logistical issues facing the ICU, and on at least one occasion she approached Denham and expressed a desire to return to school to complete her master's degree, describing her life as "at a crossroads." Further, in February 2008, Frensley made a comment that the job was making her feel "suicidal" and "homicidal." She later stated that she was just under stress at the time and regretted making the comment.

Frensley had worked under Denham prior to becoming nurse-manager. She testified that in June 2005, he ran his hands through her hair. Other nurses testified that throughout Frensley's tenure as nurse-manager of the ICU, Denham made comments about her appearance, hair style, makeup, weight, and clothing. One nurse testified that Denham told Frensley that he could "see every dimple" in her buttocks when she wore a particular pair of pants. Further, one nurse testified that she overheard Denham invite Frensley to his house for dinner and to go out for drinks after work.

On March 12, 2008, Denham called Frensley. They initially discussed business related to the ICU, but he then stated that he was sitting, watching the boats and sunset, and having a few beers. He asked her why she always addressed him as "Sir," and why she would not just call him "Mike." He said that he felt like he could talk to her and asked why she was "always so uptight."

He invited her over to his house for a drink, and she declined, stating that he was her boss and that she respected him. Frensley testified that his voice was "sultry" throughout the conversation, until she declined his offer to come over for a beer. She stated that once she declined his offer, his demeanor changed and he said she could bring her children over with her.

In March 2008, it became apparent to Stokes that a decision to split the ICU into two units was forthcoming. Under this plan, the ICU would divided into two units: the Medical Intensive Care Unit (MICU) and the Surgical Intensive Care Unit (SICU). Frensley's position as nurse-manager of the ICU would be eliminated and two new nurse-manager positions - one for each new unit - would be created. Denham was to oversee the SICU, and Donna Lewis was to oversee the MICU. Accordingly, on March 13, 2008, Stokes directed Denham, Lewis, and other management employees to plan the transition's logistics, including staffing.

On March 17, 2008, the task force officially decided to divide the ICU into the SICU and MICU. On March 18, 2008, Denham, Lewis, and at least one other employee submitted a joint recommendation that interview teams should be utilized to select a new nurse-manager for each unit. Stokes testified that based on Frensley's prior attempts to resign as nurse-manager and her expressed dissatisfaction with the job, there was never any question that the two new nurse-manager positions would be open to all applicants.

On April 18, 2008, Denham and Lewis met with Frensley and several other nurses and told them about the decision to split the ICU into two units. They explained that each unit would have a separate nurse-manager. When someone at the meeting asked where Frensley would be, Denham made a hand motion toward himself, which Frensley interpreted as an indication that she would be the nurse-manager of the SICU. However, when she approached Denham at some point after the

3

meeting, he stated that she could apply for the job like anyone else, and that she was also free to take a staff nurse position.

On April 24, 2008, Frensley went on a planned vacation period, which was scheduled to end on May 4, 2008. Before her vacation ended, Frensley requested and was granted FMLA leave beginning on May 7, 2008. She remained on FMLA leave until August 4, 2008.

On May 9, 2008, Frensley met with Rodger Brown, the vice-president for human resources at NMMC. She expressed her concern with losing her job and alleged that Denham was retaliating against her for declining his invitation during the March 12, 2008, phone call. Brown asked her to document her allegations and return to him with a written account. While waiting for Frensley to return her documentation, Brown investigated her allegations. On May 12, 2008, he interviewed Denham, who did not recall calling Frensley but denied that he had asked her to his house. On May 29, 2008, Brown asked Frensley, via e-mail, if she had finished her documentation. She responded that she had not, due to an illness, but that she would do so. Brown did not hear from her again until after her FMLA leave concluded.

On August 5, 2008, Brown met with Frensley to talk about her job situation. Frensley had enrolled at school full-time at the University of Southern Alabama, and, as such, she desired a part-time position. Frensley inquired as to the status of her retaliation complaint. Brown told her that Denham denied inviting her to his house, and Brown asked her to tell him everything Denham had said or done that she believed to be sexual harassment. Plaintiff cited the above-referenced comments about her appearance and attire, the 2005 hair-touching incident, and the March 12, 2008, phone call. Brown again asked her to put her complaints in writing and to provide him with any documentation that may aid his investigation. He also told her that she could use her vacation time

4

over the next thirty days to secure a new position at NMMC.

On August 7, 2008, Brown sent Frensley a letter, with a written account of everything that was said at the meeting. He again requested that she provide him with a written account of her complaints, and any supporting documentation. Frensley never responded. Brown concluded his investigation, having spoken to Denham, Frensley, and every available person Frensley claimed was a witness to the alleged harassment. On September 23, 2008, he sent her another letter, in which he again described her allegations. He then recounted what he had been told by several witnesses, including Denham. Based on Frensley's statements and all of the information supplied to him by others, he concluded that there was no credible evidence that Denham had sexually harassed her or that her allegations played a role in requiring her to apply for the position of nurse-manager in the SICU.

Frensley never applied for either of the new nurse-manager positions, but she did apply for transfers to a couple of other units at NMMC. She was accepted to graduate school at the University of South Alabama in May 2008, and was enrolled there by August 2008. She also began working at Methodist Hospital in Memphis, Tennessee in September 2008. The interview team comprised of charge and staff nurses, administrative staff, and physicians selected a man as the SICU nurse-manager, but he resigned after three months. The position was subsequently filled with a woman.

Plaintiff filed the present action on May 8, 2009. She believes that Denham retaliated against her refusal to come to his house on March 12, 2008, by 1) splitting the ICU into two units, and thus eliminating her position; and 2) failing to hire her as the nurse-manager of the newly-formed SICU.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate when the evidence shows that there is no genuine issue

5

as to any material fact and that the movant is entitled to judgment as a matter of law." Salinas v. AT&T Corp., 314 F. App'x 696, 697 (5th Cir. 2009) (quoting FED. R. CIV. P. 56(c)). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant." Agnew v. Washington Mut. Fin. Group, LLC, 244 F. Supp. 2d 672, 675 (N.D. Miss. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

If a movant shows that there is no genuine issue of material fact, the nonmovant must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting FED. R. CIV. P. 56(c), (e)). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." Oliver v. Scott, 276 F.3d 736, 744 (5th Cir. 2002).

The Court is not to weigh the evidence or engage in credibility determinations. Anderson, 477 U.S. at 249, 106 S. Ct. 2505; Deville v. Marcantel, 567 F.3d 156, 164 (5th Cir. 2009). "[T]he court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Deville, 567 F.3d at 164.

### III. DISCUSSION

Plaintiff alleges a single cause of action against Denham: malicious interference with employment. Mississippi law does not recognize a tort of malicious interference with employment,

6

per se. Hinton v. Eagle One Logistics, 2009 U.S. Dist. LEXIS 62417, *26 (S.D. Miss. July 20, 2009); Smith v. Murphy & Sons, Inc., 2007 U.S. Dist. LEXIS 64063, *33-*34 (N.D. Miss. Aug. 28, 2007); Crabb v. Itawamba County, 2005 U.S. Dist. LEXIS 36859, *10 (N.D. Miss. Oct. 11, 2005). Rather, the Court typically addresses such claims as claims of tortious interference with contractual relations. Gibson v. Estes, 2008 U.S. Dist. LEXIS 63457, *5 (N.D. Miss. Aug. 13, 2008); Crabb, 2005 U.S. Dist. LEXIS 36859 at *10; McClinton v. Delta Pride Catfish, Inc., 792 So. 2d 968, 976 (Miss. 2001); Hollywood Cemetery Ass'n v. Bd. of Mayor & Selectmen, 760 So. 2d 715, 719 (Miss. 2000); Levens v. Campbell, 733 So. 2d 753, 759-61 (Miss. 1999); Perkins v. Wal-Mart Stores, Inc., 2010 Miss. App. LEXIS 99, *16-*17 (Miss. Ct. App. Feb. 23, 2010).

"To establish a claim of tortious interference with contractual relations, a plaintiff must prove: (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted." Neider v. Franklin, 844 So. 2d 433, 437 (Miss. 2003); see also McClinton, 792 So. 2d at 976 (citing Hollywood Cemetery Ass'n, 760 So. 2d at 719; Par Indus., Inc. v. Target Container Co., 708 So. 2d 44, 48 (Miss. 1998); Cenac v. Murry, 609 So. 2d 1257, 1268-69 (Miss. 1992)). Additionally, a plaintiff "must prove that the contract would have been performed but for the alleged interference." Perkins, 2010 Miss. App. LEXIS 99 at *16 (punctuation omitted) (quoting Grice v. FedEx Ground Package Sys., Inc., 925 So. 2d 907, 910 (Miss. Ct. App. 2006)); see also Sparks v. Region, 2009 U.S. Dist. LEXIS 100225, *15 (N.D. Miss. Oct. 27, 2009) (citing Ward v. Life Investors Ins. Co., 383 F. Supp. 2d 882, 888 (S.D. Miss. 2005)). Furthermore, there can be no tortious interference with contract when there has been

no breach of contract. Levens, 733 So. 2d at 760.

### A. *Elimination of the ICU Nurse-Manager Position*

Plaintiff first argues that Denham maliciously interfered with her employment contract by splitting the ICU into two separate units and, therefore, eliminating her position. However, she admits that she has no knowledge as to whether Denham was the one who made the decision to split the unit. She merely believes that to be the case and has presented no evidence to support her belief.

The undisputed evidence in the record indicates that a task force comprised of several individuals decided to split the ICU into two units. Plaintiff admitted that she was aware of the task force's existence, and she admitted that there were multiple doctors on the committee. Indeed, she specifically named several doctors besides Denham who were members of the task force. Further, Stokes testified that he directed Denham, Lewis, and two other individuals to work together to form a plan that addressed the logistics of the ICU division. The record contains an e-mail from March 13, 2008, in which Stokes instructed them to form a plan as to how they would select new leadership.

Therefore, the evidence in the record clearly indicates that the elimination of Frensley's job was the consequence of a decision by a task force comprised of multiple individuals - not the individual actions of Denham. Plaintiff has offered no evidence of any actions by Denham which led to the task force's decision, and her unsubstantiated belief that Denham orchestrated the restructuring of the ICU in order to retaliate against her for refusing his invitation is insufficient to satisfy her summary judgment burden. Lawrence v. Univ. of Tex. Med. Branch of Galveston, 163 F.3d 309, 312 (5th Cir. 1999) ("unsubstantiated assertions," "conclusory allegations," "speculation," and "conjecture" are insufficient to meet a non-moving party's summary judgment burden); Hinton,

8

2009 U.S. Dist. LEXIS 62417 at *27 (where plaintiff failed to set forth any facts supporting her malicious interference claim, summary judgment was granted). Accordingly, the Court grants Denham's Motion for Summary Judgment as to Frensley's malicious interference claim stemming from the elimination of her job as nurse-manager of the ICU.

### B.     *Failure to Hire Plaintiff as SICU Nurse-Manager*

Plaintiff also argues that Denham retaliated against her by not giving her the nurse-manager position in the SICU. However, the tort of malicious interference with employment contract presupposes the existence of an employment contract, and no employment relationship ever existed between NMMC and Frensley with respect to the SICU position. In order for Denham to have tortiously interfered with Frensley's employment as the SICU nurse-manager, she first had to be employed as the SICU nurse-manager. Phrased differently: Denham could not have tortiously interfered with Frensley's employment contract with respect to the SICU position, in that there was no SICU employment contract with which he could interfere. See Levens, 733 So. 2d at 760 (for there to be a malicious interference with an employment contract, there must be a breach of contract); Perkins, 2010 Miss. App. LEXIS 99 at *16 (plaintiff must prove that a contract would have been performed but for the alleged interference); Sparks, 2009 U.S. Dist. LEXIS 100225 at *15. Accordingly, the Court grants Denham's Motion for Summary Judgment as to Frensley's malicious interference claim stemming from the failure to hire her as SICU nurse-manager.

### IV. CONCLUSION

For the reasons cited above, the Court grants Defendant Michael Denham's Motion for Summary Judgment. An order consistent with this opinion will issue on this, the 5th day of August, 2010.

/s/ Sharion Aycock
**UNITED STATES DISTRICT JUDGE**