**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**JENNIFER FRENSLEY**                                                                            **PLAINTIFF**

**V.**                                                         **CIVIL ACTION NO. 1:09-CV-118-SA-JAD**

**NORTH MISSISSIPPI MEDICAL CENTER,
INC., et al.**                                                                         **DEFENDANTS**

**MEMORANDUM OPINION**

For the reasons stated below, the Court grants Defendant's Motion for Summary Judgment [45].

**I. BACKGROUND**

Jennifer Frensley became the interim nurse-manager of the Intensive Care Unit (ICU) at North Mississippi Medical Center (NMMC) in December 2006, and she became the nurse-manager of the ICU in April 2007. At that time, NMMC's ICU provided services to both medical patients and surgery patients. As nurse-manager, Frensley was responsible for managing the daily activities of the ICU, under the supervision of Michael Denham.

In August 2007, NMMC administrators and physicians became concerned that ICU patients were being diverted to other hospitals more often than was reasonable, a practice that adversely impacted the financial position of the hospital. Around the end of 2007, the hospital's Medical Executive Committee addressed the issue by forming a task force to investigate. Numerous physicians and management staff associated with the ICU - including Denham - were members of the task force. The task force addressed topics of staffing, training, leadership within the ICU, and how they could avoid further diversion of patients. Frensley herself attended some task force meetings.

On a few occasions during her tenure as nurse-manager, Frensley expressed frustration with the challenges of managing the ICU. In August 2007, she tendered a written resignation to Denham. She then met with Denham and Charles Stokes - the president of NMMC - to discuss potential methods of addressing the ICU's staffing problems, and she agreed to remain in the nurse-manager position. After this meeting, Denham assigned a personal assistant to relieve some of Frensley's administrative duties. However, Frensley continued to experience frustration with the logistical issues facing the ICU, and, on at least one occasion, she approached Denham and expressed a desire to return to school to complete her master's degree, describing her life as "at a crossroads." Further, in February 2008, Frensley made a comment that the job was making her feel "suicidal" and "homicidal." She later stated that she was just under stress at the time and regretted making the comment.

Frensley had worked under Denham prior to becoming nurse-manager. She testified that in June 2005, he ran his hands through her hair. Other nurses testified that throughout Frensley's tenure as nurse-manager of the ICU, Denham made comments about her appearance, hair style, makeup, weight, and clothing. One nurse testified that Denham told Frensley that he could "see every dimple" in her buttocks when she wore a particular pair of pants. Further, one nurse testified that she overheard Denham invite Frensley to his house for dinner and to go out for drinks after work.

On March 12, 2008, Denham called Frensley. They initially discussed business related to the ICU, but he then stated that he was sitting, watching the boats and sunset, and having a few beers. He asked her why she always addressed him as "Sir," and why she would not just call him "Mike." He said that he felt like he could talk to her and asked why she was "always so uptight."

2

He invited her over to his house for a drink, and she declined, stating that he was her boss and that she respected him. Frensley testified that his voice was "sultry" throughout the conversation, until she declined his offer to come over for a beer. She stated that once she declined his offer, his demeanor changed and he said she could bring her children over with her.

In March 2008, it became apparent to Stokes that a decision to split the ICU into two units was forthcoming. Under this plan, the ICU would divided into two units: the Medical Intensive Care Unit (MICU) and the Surgical Intensive Care Unit (SICU). Frensley's position as nurse-manager of the ICU would be eliminated and two new nurse-manager positions - one for each new unit - would be created. Denham was to oversee the SICU, and Donna Lewis was to oversee the MICU. Accordingly, on March 13, 2008, Stokes directed Denham, Lewis, and other management employees to plan the transition's logistics, including staffing.

On March 17, 2008, the task force officially decided to divide the ICU into the SICU and MICU. On March 18, 2008, Denham, Lewis, and at least one other employee submitted a joint recommendation that interview teams should be utilized to select a new nurse-manager for each unit. Stokes testified that based on Frensley's prior attempts to resign as nurse-manager and her expressed dissatisfaction with the job, there was never any question that the two new nurse-manager positions would be open to all applicants.

On April 18, 2008, Denham and Lewis met with Frensley and several other nurses and told them about the decision to split the ICU into two units. They explained that each unit would have a separate nurse-manager. When someone at the meeting asked where Frensley would be, Denham made a hand motion toward himself, which Frensley interpreted as an indication that she would be the nurse-manager of the SICU. However, when she approached Denham at some point after the

meeting, he stated that she could apply for the job like anyone else, and that she was also free to take a staff nurse position.

On April 24, 2008, Frensley went on a planned vacation period, which was scheduled to end on May 4, 2008. Before her vacation ended, Frensley requested and was granted FMLA leave beginning on May 7, 2008. She remained on FMLA leave until August 4, 2008.

On May 9, 2008, Frensley met with Rodger Brown, the vice-president for human resources at NMMC. She expressed her concern with losing her job and alleged that Denham was retaliating against her for declining his invitation during the March 12, 2008 phone call. Brown asked her to document her allegations and return to him with a written account. While waiting for Frensley to return her documentation, Brown investigated her allegations. On May 12, 2008, he interviewed Denham, who did not recall calling Frensley but denied that he had asked her to his house. On May 29, 2008, Brown asked Frensley, via e-mail, if she had finished her documentation. She responded that she had not, due to an illness, but that she would do so. Brown did not hear from her again until after her FMLA leave concluded.

On August 5, 2008, Brown met with Frensley to talk about her job situation. Frensley had enrolled at school full-time at the University of Southern Alabama, and, as such, she desired a part-time position. Frensley inquired as to the status of her retaliation complaint. Brown told her that Denham denied inviting her to his house, and Brown asked her to tell him everything Denham had said or done that she believed to be sexual harassment. Plaintiff cited the above-referenced comments about her appearance and attire, the 2005 hair-touching incident, and the March 12, 2008 phone call. Brown again asked her to put her complaints in writing and to provide him with any documentation that may aid his investigation. He also told her that she could use her vacation time

over the next thirty days to secure a new position at NMMC.

On August 7, 2008, Brown sent Frensley a letter, with a written account of everything that was said at the meeting. He again requested that she provide him with a written account of her complaints, and any supporting documentation. Frensley never responded. Brown concluded his investigation, having spoken to Denham, Frensley, and every available person Frensley claimed was a witness to the alleged harassment. On September 23, 2008, he sent her another letter, in which he again described her allegations. He then recounted what he had been told by several witnesses, including Denham. Based on Frensley's statements and all of the information supplied to him by others, he concluded that there was no credible evidence that Denham had sexually harassed her or that her allegations played a role in requiring her to apply for the position of nurse-manager in the SICU.

Frensley never applied for either of the new nurse-manager positions, but she did apply for transfers to a couple of other units at NMMC. She was accepted to graduate school at the University of South Alabama in May 2008, and was enrolled there by August 2008. She also began working at Methodist Hospital in Memphis, Tennessee in September 2008. The interview team comprised of charge and staff nurses, administrative staff, and physicians selected a man as the SICU nurse-manager, but he resigned after three months. The position was subsequently filled with a woman.

Plaintiff filed the present action on May 8, 2009. She asserts a variety of claims under Title VII. First, she alleges that NMMC discriminated against her on the basis of her sex by eliminating her position as nurse-manager of the ICU and not hiring her as nurse-manager of the SICU. Next, she alleges that NMMC is liable for sexual harassment. Finally, she contends that NMMC retaliated against her by eliminating her position as nurse-manager of the ICU and by failing to hire her as

nurse-manager of the SICU.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate when the evidence shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Salinas v. AT&T Corp., 314 F. App'x 696, 697 (5th Cir. 2009) (quoting FED. R. CIV. P. 56(c)). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant." Agnew v. Washington Mut. Fin. Group, LLC, 244 F. Supp. 2d 672, 675 (N.D. Miss. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

If a movant shows that there is no genuine issue of material fact, the nonmovant must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting FED. R. CIV. P. 56(c), (e)). "When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." Oliver v. Scott, 276 F.3d 736, 744 (5th Cir. 2002).

The Court is not to weigh the evidence or engage in credibility determinations. Anderson, 477 U.S. at 249, 106 S. Ct. 2505; Deville v. Marcantel, 567 F.3d 156, 164 (5th Cir. 2009). "[T]he court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Deville, 567 F.3d at 164.

## III. DISCUSSION

*A.     Sexual Harassment*

The first task of the Court, when evaluating a claim of sexual harassment under Title VII, is to "determine whether the complaining employee has suffered a 'tangible employment action.'" Williams v. Barnhill's Buffet, Inc., 290 F. App'x 759, 761 (5th Cir. 2009) (citing Casiano v. AT&T Corp., 213 F.3d 278, 283 (5th Cir. 2000)); see also Russell v. Univ. of Tex., 234 F. App'x 195, 201 (5th Cir. 2007). "If she has, her suit is classified as a 'quid pro quo' case; if she has not, her suit is classified as a 'hostile environment' case." Williams, 290 F. App'x at 761; Russell, 234 F. App'x at 201. A "tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Alaniz v. Zamora-Quezada, 591 F.3d 761, 772 (5th Cir. 2009) (citing La Day v. Catalyst Tech. Inc., 302 F.3d 474, 481-82 (5th Cir. 2002)). It is undisputed that Plaintiff's job was eliminated when Defendant restructured the ICU, and that Defendant did not hire Plaintiff as the nurse-manager of the SICU. Therefore, Plaintiff has suffered a tangible employment action, and this is a "quid pro quo" case. See Kolpakchi v. Principi, 113 F. App'x 633, 639 (5th Cir. 2004) (eliminating plaintiff's position and not hiring her for the new one created in its place were tangible employment actions).

"To establish a Title VII quid pro quo claim, a plaintiff must show that the acceptance or rejection of a supervisor's alleged sexual harassment resulted in a 'tangible employment action.'" Alaniz, 591 F.3d at 772 (citing La Day, 302 F.3d at 481). The Fifth Circuit has defined "unwelcome sexual harassment" as "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is

undesirable or offensive to the employee." Marquez v. Voicestream Wireless Corp., 115 F. App'x 699, 701 (5th Cir. 2004). The plaintiff must show a "causal nexus between the acceptance or rejection of the sexual advances and the tangible employment action." Id. (punctuation omitted). She may do this by presenting evidence that her "acceptance or rejection of the harassment was an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment." Sanders v. Casa View Baptist Church, 134 F.3d 331, 339 (5th Cir. 1998). "If the employee proves that the tangible employment action resulted from her acceptance or rejection of her supervisor's sexual advances, then the employer is vicariously liable." Russell, 234 F. App'x at 202.

### 1. *Elimination of ICU Nurse-Manager Position*

Plaintiff argues that Denham eliminated her position as nurse-manager of the ICU because she rejected his invitation to come to his house for a drink on March 12, 2008. Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to make out a prima facie quid pro quo claim with regard to the restructuring of the ICU, insofar as she has not presented sufficient evidence of causation.

Plaintiff has presented the following evidence of a causal nexus between her rejection of Denham's invitation and the decision to restructure the ICU: 1) she believes that Denham orchestrated the elimination of her job, and 2) Defendant officially decided to restructure the ICU on March 17, 2008 - less than a week after she rejected Denham's invitation. However, Plaintiff admitted having discussed the restructuring of the ICU on August 6, 2007 - seven months before she declined Denham's invitation. In fact, she testified that she "recommended a split." Likewise, Defendant has presented other undisputed testimony that talk of restructuring the ICU first began in August, 2007. Further, Donna Lewis testified that Charles Stokes told her on March 4, 2008, that

the ICU was likely going to be split into two units. Therefore, the undisputed evidence in the record indicates that the restructuring of the ICU was considered long before Plaintiff rejected Denham's invitation.

The only evidence Plaintiff has presented as to causation with respect to the elimination of her position is her own belief and the temporal proximity of her rejection of Denham's invitation to the official decision to restructure. This is not sufficient to avoid summary judgment. Russell, 234 F. App'x at 202 (temporal proximity is insufficient to prove causation for quid pro quo claims); Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (employee's belief that she suffered an adverse employment action as a result of discrimination, without more, in insufficient to survive a summary judgment motion). Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's quid pro quo sexual harassment claim for the elimination of her job as nurse-manager of the ICU.

  *2.     Failure to Hire as Nurse-Manager of SICU*

Plaintiff also argues that Denham failed to hire her as nurse-manager of the SICU because she rejected his invitation to come to his house for a drink. However, Plaintiff has offered nothing more than her own belief and the temporal proximity of the events to support the causation element of a quid pro quo claim. These are insufficient to show causation, as noted above. Russell, 234 F. App'x at 202; Douglass, 79 F.3d at 1430.

Denham admitted that he could have offered Plaintiff the SICU nurse-manager position, but he did not. He gave two reasons why he did not do so. First, he expressed concerns over her previous attempts to resign as nurse-manager of the ICU. He testified that she submitted a letter of resignation in late 2007 and then attempted to verbally resign on at least three other occasions.

Indeed, Plaintiff testified that she felt overwhelmed in the ICU nurse-manager position. She admitted that she submitted a letter of resignation on August 6, 2007, but agreed to remain in the position after they hired an assistant. Further, Stokes - then the president of NMMC - testified: "Based on [Plaintiff's] prior resignation and expressed dissatisfaction with the nurse manager job, there was never a question for me that the two new nurse manager jobs would be open to all applicants."

Second, Denham testified that Stokes recommended that they use a committee in hiring the nurse-manager for the SICU, rather than Denham simply selecting someone for the position. The record also shows that Denham, Donna Lewis (head of the MICU), and George Hand (an administrator at NMMC and member of the ICU task force) submitted a joint letter on March 18, 2008, recommending that interview teams select the nurse-managers. Denham testified that he was a member of the interview committee, but he neither made a recommendation nor voted on the hire. Plaintiff has offered no evidence that Denham influenced the committee's decision.

As for the interview committee's decision to hire someone else for the position, Plaintiff admits that she failed to apply for the SICU nurse-manager position. Failure to apply for a position will generally bar a Title VII claim for the denial of said position. Shackelford v. DeLoitte & Touche, LLP, 190 F.3d 398, 406 (5th Cir. 1999).[1] Furthermore, Plaintiff has offered no evidence

---

[1]However, an employee's "failure to apply for the position does not bar her claim if she can show that such an application would have been a futile gesture." Id. (citing Teamsters v. United States, 431 U.S. 324, 363-66, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977); Claiborne v. Ill. C. R.R., 583 F.2d 143, 150 (5th Cir. 1978)). This exception only applies where the potential applicant shows that she "was deterred by a known and consistently enforced policy of discrimination." Id.; see also McCullough v. Houston County, Tex., 297 F. App'x 282, 287 (5th Cir. 2008). Plaintiff testified that Denham told her that it would "do [her] no good to apply" for the new positions. This is not sufficient to show a "known and consistently enforced policy of discrimination." See Irons v. Aircraft Serv. Int'l, Inc., 2010 U.S. App. LEXIS 17490, at *16 (5th

whatsoever that discriminatory animus motivated the committee's decision in part or whole.

In summary, the only evidence Plaintiff has submitted in support of her claim that Denham failed to hire her for the SICU nurse-manager position because she rejected his invitation is her own belief and the temporal proximity of the events. In contrast, Defendant has offered evidence that Denham failed to offer her the position because of her admitted attempts to resign as nurse-manager of the ICU and her admitted feelings of being overwhelmed in that position. Further, Defendant has offered evidence that the hiring decision for the SICU nurse-manager position was made by an interview committee, and that Plaintiff failed to apply for the position. Denham testified that although he was a member of the interview committee, he did not make a recommendation and did not have a vote on the hire. Plaintiff has offered no evidence to contradict this. Accordingly, the Court finds that Plaintiff has failed to show a genuine dispute of material fact as to the causation element of her quid pro quo claim for Defendant's failure to hire her as nurse-manager of the SICU. The Court grants Defendant's Motion for Summary Judgment as to that claim.

## B.  *Title VII Analytical Framework*

Plaintiff claims that Defendant discriminated against her by eliminating her position as nurse-manager of the ICU and failing to hire her as nurse-manager of the SICU. She also claims that Defendant retaliated against her for reporting sexual harassment. Defendant argues that Plaintiff has not produced any direct evidence of discrimination and, therefore, must proceed under the McDonnell Douglas "pretext" analysis, rather than the "mixed-motive" analysis of Price

---

Cir. Aug. 19, 2010) (plaintiff's allegation that he was not given the opportunity to apply because the employer approached who they wanted for the position was not sufficient to show a known and consistently enforced policy of discrimination); Shackelford, 190 F.3d at 406 (employer's statement that employee would "probably be better off" in her old position was only speculative evidence, at best, of a known and consistently enforced policy of discrimination).

Waterhouse. Compare McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), with Price Waterhouse v. Hopkins, 490 U.S. 228, 258, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989). Before the Court examines Plaintiff's remaining Title VII claims, it must establish the proper analytical framework.

McDonnell Douglas established a burden-shifting framework for the analysis of Title VII claims. McDonnell Douglas Corp., 411 U.S. at 802, 93 S. Ct. 1817. First, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas Corp., 411 U.S. at 802, 93 S. Ct. 1817; McGarry v. Univ. of Miss. Med. Ctr., 355 F. App'x 853, 857 (5th Cir. 2009). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. McDonnell Douglas Corp., 411 U.S. at 802, 93 S. Ct. 1817; McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2007). "The employer's burden is only one of production, not persuasion, and involves no credibility assessment." McCoy, 492 F.3d at 557. It is at this point that the "pretext" analysis and the "mixed-motive" analysis diverge.

Under the pretext analysis, if the employer produces a legitimate, nondiscriminatory reason for the employment action, the plaintiff must prove that the "employer's proffered reason is not true but instead is a pretext for the real discriminatory . . . purpose." Id.; see also McDonnell Douglas Corp., 411 U.S. at 804, 93 S. Ct. 1817. The plaintiff must show that the adverse employment action taken against the plaintiff would not have occurred "but for" the protected characteristic. Walsdorf v. Bd. of Comm'rs, 857 F.2d 1047, 1052 (5th Cir. 1988). In contrast, the mixed-motive analysis of Price Waterhouse merely requires that a plaintiff prove that the protected characteristic "played a motivating part in an employment decision." Price Waterhouse, 490 U.S. at 258, 109 S. Ct. 1775.

At one time, the Fifth Circuit required that a plaintiff present direct evidence of

discrimination in order to receive the benefit of a mixed motive analysis. See Fierros v. Tex. Dep't of Health, 274 F.3d 187, 191 (5th Cir. 2001). However, the United States Supreme Court held in Desert Palace, Inc. v. Costa, that the text of Title VII allowed for a mixed-motive analysis in discrimination cases. 539 U.S. 90, 98-99, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). The Court further held that Congress's failure to require a heightened burden of proof suggested that courts should not depart from the general rule of civil litigation that "requires a plaintiff to prove his case 'by a preponderance of the evidence,' using 'direct or circumstantial evidence.'" Id. at 99, 123 S. Ct. 2148 (quoting Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 714 n. 3, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983)). Therefore, a plaintiff asserting a Title VII discrimination claim may utilize the "mixed motive" analysis whether he has presented direct or circumstantial evidence of discrimination. Id. at 101, 123 S. Ct. 2148; Smith v. Xerox Corp., 602 F.3d 320, 327-28 (5th Cir. 2010).

Recently, the Fifth Circuit Court of Appeals applied the reasoning of Desert Palace to Title VII retaliation claims. See Smith, 602 F.3d at 332. Accordingly, a Title VII plaintiff - whether asserting discrimination or retaliation claims - may now rebut a defendant's legitimate, nondiscriminatory reason for an adverse employment action by proving that "(1) the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative), or (2) the defendant's reason, though true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." Davis v. Farmers Ins. Exch., 2010 U.S. App. LEXIS 7130, at *5 (5th Cir. Apr. 6, 2010).

C.     *Sex Discrimination*

   1.     *Elimination of ICU Nurse-Manager Position*

The Court shall assume, without deciding, that Plaintiff has presented a prima facie case of discrimination under Title VII with respect to the elimination of her position as nurse-manager of the ICU. Defendant responds that the decision to restructure the ICU - which resulted in the elimination of Plaintiff's job - was a business decision motivated by the desire to reduce the number of ICU patients diverted to other hospitals. This is a legitimate, nondiscriminatory reason. See Taylor v. Albemarle Corp., 286 F. App'x 134, 134-35 (5th Cir. 2008) (reduction in force is a legitimate, nondiscriminatory reason); Gillaspy v. Dallas Indep. Sch. Dist., 278 F. App'x 307, 312 (5th Cir. 2008) (elimination of a position due to restructuring was a legitimate, nondiscriminatory reason for an adverse employment action).

Plaintiff may rebut this reason by showing that it is mere pretext for discrimination or that her sex was another motivating factor in the decision. Plaintiff contends that she has met either of these burdens, citing testimony from herself, Suzy Wright, and Michelle Daily that Denham engaged in a variety of behaviors she describes as sexual harassment.[2] In other words, Plaintiff argues that the decision to restructure the ICU was motivated by discriminatory intent because Denham participated in making the decision and had sexually harassed her in the past.

The chief event of which Plaintiff complains is Denham's phone call on March 12, 2008. Plaintiff argues: "A reasonable jury could conclude that if Frensley was a male and had declined to

---

[2]Plaintiff also cites her own belief that the decision was motivated by discrimination and the temporal proximity of the decision to her rejection of Denham's invitation to come over for a drink. As the Court has already noted, these are insufficient to avoid summary judgment. Russell, 234 F. App'x at 202; Douglass, 79 F.3d at 1430.

14

go to Denham's house to drink, he would not have received an adverse employment action like Frensley received." As the Court has already observed, all of the evidence in the record indicates that the decision to split the ICU into two units preceded Denham's phone call. Plaintiff admitted having discussed the restructuring of the ICU on August 6, 2007 - seven months before she declined Denham's invitation. In fact, she testified that she "recommended a split." Likewise, Defendant has presented other undisputed testimony that talk of restructuring the ICU first began in August, 2007. Further, Donna Lewis testified that Charles Stokes told her on March 4, 2008, that the ICU was likely going to be split into two units. Accordingly, Plaintiff's rejection of Denham's invitation is of little consequence in evaluating Defendant's motivation in restructuring the ICU.

Plaintiff has presented no other evidence that Defendant's decision to restructure the ICU was motivated by her sex. All she has established is that Denham - one member of a task force that included many doctors, nurses, and administrative staff - allegedly sexually harassed her in the past.[3] Plaintiff reasons that since Denham allegedly harassed her in the past and was on the task force which decided to split the ICU, the decision to split the ICU was motived by her sex. However, while Denham admits that he recommended they split the ICU, he also testified that he based his recommendation on Plaintiff's recommendation to split it. Indeed, Plaintiff admitted that she recommended that the ICU be split in August, 2007. Even if the task force was influenced by Denham, discussion of splitting the ICU preceded Plaintiff's rejection of his invitation. Plaintiff has offered nothing more than an inference of discrimination without factual support.

For all the preceding reasons, the Court finds that Plaintiff has not created a genuine issue

---

[3]Specifically, Plaintiff alleges that Denham commented on her hair, makeup, clothing, and general appearance; touched her hair on one occasion; and asked her to get drinks after work.

15

of material fact as to whether Defendant's stated reason for splitting the ICU was pretextual or as to whether discriminatory intent was a motivating factor in the decision. All Plaintiff has presented is her own belief and inference without facts. The Court's job in "conducting a pretext analysis is not to engage in second-guessing of an employer's business decisions." Brooks v. Lubbock Cty. Hosp. Dist., 2010 U.S. App. LEXIS 7488, at *9 (5th Cir. Apr. 12, 2010); see also LeMaire v. Louisiana, 480 F.3d 383, 391 (5th Cir. 2007). Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's discrimination claim for the elimination of her position.

*2. Failure to Hire as SICU Nurse-Manager*

The Court shall assume, without deciding, that Plaintiff has made out a prima facie case of discrimination with respect to Defendant's failure to hire her as nurse-manager of the SICU. Defendant has produced the following legitimate, nondiscriminatory reason for its failure to hire her as nurse-manager of the SICU: she did not apply for the job. See Shackelford, 190 F.3d at 406. However, an employee's "failure to apply for the position does not bar her claim if she can show that such an application would have been a futile gesture." Id. (citing Teamsters, 431 U.S. at 363-66, 97 S. Ct. 1843; Claiborne, 583 F.2d at 150). This exception only applies where the potential applicant shows that she "was deterred by a known and consistently enforced policy of discrimination." Id.; see also McCullough, 297 F. App'x at 287. Plaintiff testified that Denham told her that it would "do [her] no good to apply" for the new positions. This is not sufficient to show a "known and consistently enforced policy of discrimination." See Irons, 2010 U.S. App. LEXIS 17490 at *16 (plaintiff's allegation that he was not given the opportunity to apply because the employer approached who they wanted for the position was not sufficient to show a known and consistently enforced policy of discrimination); Shackelford, 190 F.3d at 406 (employer's statement

that employee would "probably be better off" in her old position was only speculative evidence, at best, of a known and consistently enforced policy of discrimination). Indeed, Plaintiff admitted that she could have applied for the position.

Furthermore, it is undisputed that Denham did not vote on the hiring decision and offered no recommendation to the committee. Plaintiff has offered no evidence that Denham influenced the committee, and she has offered no evidence that any discriminatory animus motivated the committee's decision, in part or whole. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's discrimination claim for the failure to hire her as nurse-manager of the SICU.

### D.    *Retaliation*

Title VII "outlaws any discrimination against an employee, because that employee 'has opposed any practice made an unlawful employment practice' by the Act." Kolpakchi, 113 F. App'x at 638 (quoting 42 U.S.C. § 2000e-3(a)). To establish a prima facie case of retaliation under Title VII, Plaintiff must show "(1) that her activity was protected by Title VII; (2) that she has suffered an adverse employment action; and (3) that there existed a 'causal link' between the action and the protected activity." Id. (citing Roberson v. Alltel Info. Servs., 373 F.3d 647, 655 (5th Cir. 2004)).

#### 1.    *Elimination of ICU Nurse-Manager Position*

Plaintiff has not made out a prima facie case of retaliation with respect to the elimination of her position as nurse-manager of the ICU insofar as she has not shown a causal link between the elimination of her position and any protected activity. First, the Court notes that she did not report any sexual harassment until May 9, 2008. Plaintiff admitted that she never made any complaint of sexual harassment until *after* the decision to restructure the ICU had been made. Therefore, her

17

complaint of sexual harassment could not have caused the decision to restructure the ICU.

Plaintiff argues that her rejections of Denham's alleged sexual harassment constituted protected activity and that the decision to split the ICU was retaliation for said rejections. Even if her rejections constituted protected activity, Plaintiff has presented no evidence that the task force which decided to split the ICU was aware of Denham's alleged advances and her rejection thereof. Although the record shows that both she and Denham participated in the task force, there is no evidence that her rejections of Denham's alleged advances played any part in the decision to split the ICU. Accordingly, she has not shown a causal nexus between any protected activity and the decision to split the ICU. See Manning v. Chevron Chem. Co., L. L. C., 332 F.3d 874, 883 (5th Cir. 2003) ("[I]n order to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity.").

For the above reasons, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claim for the elimination of her position as nurse-manager of the ICU.

### 2. *Failure to Hire as SICU Nurse-Manager*

The Court shall assume, without deciding, that Plaintiff has made out a prima facie case of retaliation with respect to Defendant's failure to hire her as nurse-manager of the SICU. Defendant has produced the following legitimate, nondiscriminatory reason for its failure to hire her as nurse-manager of the SICU: she did not apply for the job. See Shackelford, 190 F.3d at 406. Her failure to apply will not bar her retaliation claim if she can show that an application would have been a futile gesture. Id. This exception only applies if she can show that she "was deterred by a known and consistently enforced policy of discrimination." Id.; McCullough, 297 F. App'x at 287. As the Court has already observed, Plaintiff testified that Denham told her it would "do [her] no good to

apply" for the new positions. This is not sufficient to show a "known and consistently enforced policy of discrimination." See Irons, 2010 U.S. App. LEXIS 17490 at *16 (plaintiff's allegation that he was not given the opportunity to apply because the employer approached who they wanted for the position was not sufficient to show a known and consistently enforced policy of discrimination); Shackelford, 190 F.3d at 406 (employer's statement that employee would "probably be better off" in her old position was only speculative evidence, at best, of a known and consistently enforced policy of discrimination).

Furthermore, it is undisputed that Denham did not vote on the hiring decision and offered no recommendation to the committee. Plaintiff has offered no evidence that Denham influenced the committee, and she has offered no evidence that any discriminatory animus motivated the committee's decision, in part or whole. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claim for its failure to hire her as SICU nurse-manager.

## IV. CONCLUSION

For the reasons cited above, the Court grants Defendant's Motion for Summary Judgment [45]. An order consistent with this opinion will issue on this, the 9th day of September, 2010.

/s/ Sharion Aycock  
**UNITED STATES DISTRICT JUDGE**